THOMAS J. KERR *et al.*

*v.*

SAMUEL SHARP.

1. MONEY HAD AND RECEIVED—*money not invested as agreed.* Where a member of a firm of real estate brokers receives money with which to purchase land for the person advancing the same, and passes the same over to a partner, who deposits the same to the credit of the firm, and the proof fails to show that it was invested as agreed, the whole firm will be liable in assumpsit to the party so advancing, for the amount, with six per cent interest.

2. AGENCY—*ratification of purchase by agent.* Where a party receives money to purchase a particular lot, which he fails to do, and when sued for the money, if he sets up a purchase of other property, and insists the party advancing the money ratified his purchase, he must show the contract of purchase, or its loss and contents, and that such party was informed of all the material facts.

3. Before a person can be bound by ratification of an act done in his behalf, it must appear that he was informed of all the material facts in the transaction.

APPEAL from the Circuit Court of Cook county; the Hon. HENRY BOOTH, Judge, presiding.

This was an action of assumpsit, by Sharp, against Thomas J. Kerr, Lyne S. Davidson and Fletcher G. Welch, the declaration containing only the common counts.

A trial was had, resulting in a verdict and judgment in favor of the plaintiff for $630. The other material facts, as deduced from the evidence, appear in the opinion of the court.

Mr. F. W. S. BRAWLEY, for the appellants.

Mr. NELSON RUSH, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Appellee, a resident of Columbus, Ohio, being in Chicago in the fall of 1871, and being acquainted with appellant Kerr, through him became acquainted with the other appellants. They were in partnership in the transaction of real estate

business. Appellee had several conversations with Kerr in reference to investing in real estate on speculation. Kerr showed him a lot on Franklin street, also another on Randolph street. After appellee returned home, in December of the same year, Kerr wrote him, saying the Franklin street lot could be had at a bargain if appellee would send him $500. He sent the amount requested, the receipt of which Kerr acknowledged under date of December 27, of the same year. Kerr, in that letter, says that, after writing him in reference to the Franklin street property, he had received a letter from Mr. Thomas, of Kentucky, the owner of sixty feet on Madison street, offering to sell it at $9000, and he had taken that instead of the Franklin street lot. In the letter he spoke of expecting profits by the next spring of what seems to us as being almost fabulous.

It seems that appellants' firm were agents in the management of Thomas' property in Chicago, and that Kerr, on the receipt of the draft, passed it over to one of his partners and he to the bank, and it was entered to the credit of his firm. Kerr testified, that on receiving it he acknowledged the receipt of the draft, and wrote to Thomas. Davidson testified, that about the 10th of January, 1872, he gave Thomas credit on their books for the money on sale of the lot, and in February or March, sent it to Thomas; and they frequently sent him money on collections of rents and sales of property in the city.

We fail to find any evidence, in the record, that Thomas ever agreed to sell the property to appellee or any one else, or anything in reference to the terms of sale, times of payment, or other particulars in reference to it. So far as that is concerned we are left entirely without any light. Kerr testified he had received a letter from appellee which was lost, in which he expressed himself satisfied with what Kerr had done; that up to 1874 he, in frequent conversations, so expressed himself during the years of 1872 and 1873. Appellee testified that he went to Chicago in the spring of 1872, and called to see how appellants had taken the sixty feet spoken of in Kerr's letter,

in which he stated he had declined an offer of $1000 already, but had declined because they should get $200 per foot, and expected to get $3000 advance, or $2000 at least. Kerr then said they could sell for $175 or $200 per foot at an early day, and wanted appellee to leave the $500 until they sold, when appellee should have the $500 and half the profits on the sale. He then told Kerr that he would need the money, and spoke often to Kerr about it; told Kerr he should expect a good rate of interest. Kerr said it would be all right; that he wanted appellee to wait until they sold.

Kerr testified that he and appellee had frequent conversations about selling the property, and hoped to do so until in 1874; but not being sold, appellee said he thought Kerr ought to pay the money back. On cross-examination, witness stated he had promised to pay the money back, and it was still his intention to pay him.

The jury below found a verdict, in favor of plaintiff, for the $500 advanced, with six per cent interest. The court overruled a motion for a new trial and rendered judgment on the verdict, and defendants appeal.

It is insisted that the evidence fails to sustain the verdict; that it shows the money received from appellee was paid to Thomas on the purchase of the lot, and that appellants should not be held liable. They contend that the money was so paid under the direction of appellee, or, if not, then he fully ratified their act in so paying it. In the entire evidence, and all three of appellants gave testimony, we do not find any explanation why the contract with Thomas was not produced; or, if lost or destroyed, why was that fact not shown, and its contents proved? Can appellants suppose that a jury would be inclined to believe, unless it was on strong proof, that a man, desiring to sell a lot worth $9000 or more, would be willing to sell it for that sum, give an obligation to convey it, and only receive in hand little over five per cent of the purchase money, and then wait quietly between two and three years, without obtaining anything more, and still take no steps to relieve the property from such an incumbrance?

Why withhold all information as to the terms and conditions of the purchase, when Kerr acknowledged the receipt of the money by letter, in which he informed appellee he had purchased the lot? How or why did Thomas only exact so small a sum on so large a sale? Why were no further payments to be made for years, as we must infer, when between two and three years had elapsed and defendants were still urging appellee to wait for his money until the property could be sold? Such conduct is unusual, in fact rare, if such a purchase was in fact made. The whole claim about a purchase seems so unusual and unreasonable that it was not singular that the jury discredited the whole claim, or that it had no other existence than with appellants, without the knowledge or concurrence of Thomas. They were his agents to sell the land, and they could readily make a memorandum in their books that appellee had paid that amount on the purchase, with the design of refunding it when the property should be sold, and call it a sale. Or they may have resorted to some other trick to deceive appellee. If there was a legal, binding contract, why not produce it, or at least prove its contents? If authorized to sell on such extraordinary terms why not show the authority? If not authorized, then it would look as though, as his agents, they were not protecting the interests of Thomas. We think the jury were authorized, from the evidence, to believe that no legal or valid purchase had been made.

It is urged that there is not sufficient evidence to show that appellants are liable, but it only shows that Kerr received the draft and the money was paid to Thomas. It does show that the draft was received by Kerr, passed over to Davidson, who paid it into the bank and had it placed to the credit of the firm. This, then, placed it in the hands of and under the control of the firm. Then how do they show that it went out of their hands? They say it was paid to Thomas; but on what account? Was it paid on the purchase which they claim was made of him, or was it paid on their indebtedness to him? They fail to inform us on which account. If not paid on a purchase, then surely no one would contend that appellants

were not liable to refund it to appellee. If paid for their own indebtedness they then betrayed their trust and perverted the fund. It is true, Davidson says he sent the money to Thomas and credited him with that amount on sale of the lot. But the credit, as he states it, was not on a sale to appellee, but on a sale generally, not specifying to whom it was made. This may, for anything appearing from the evidence, have been on a sale intended to be made in the future.

Why should Kerr, after all of this claim of the purchase, promise to refund the money, and say he still intended to repay it? If it be said he intended to do so when the lot should be sold, by what right could he take the money from Thomas for the purpose? If it was paid to Thomas on a purchase it became his money, and not that of Kerr or the firm, and they could not honestly restore it to appellee, without the authority of Thomas, from his funds, whether arising from the sale of the lot or from any other source, and they do not pretend they had such authority. This seems to be but a mere pretext. The money having gone into the possession of the firm, and they having failed to satisfactorily show that they had paid it out for appellee's use, the firm were liable for its payment, and if it needed any further obligation, that was given when Kerr promised to pay it.

It is said that appellee ratified the purchase. How could he ratify what he did not understand? There is no evidence, that if a purchase was ever made, appellants, or either of them, ever explained to him the terms of the agreement, and if he did not know its provisions, how can any one suppose he would do so unreasonable a thing as to ratify it? When the ratification of such an act is relied on to bind a person, it must appear that he was informed of all the material particulars of the transaction. We can not see that there was any purchase to ratify; and if there was, it does not appear, if appellee ratified it, that he knew what he was sanctioning. We are wholly unable to see how the jury could have found a different verdict on this evidence.

We do not believe that there was any error in the instructions, and hence the court did not err in overruling the motion for a new trial, and the judgment must be affirmed.

*Judgment affirmed.*